**H.K. PORTER COMPANY, INC.,**
Plaintiff-Appellant,

v.

**METROPOLITAN DADE COUNTY, John Dyer, individually and as Contracting Officer for Metropolitan Dade County, Defendants-Appellees.**

No. 86–5448.

United States Court of Appeals,
Eleventh Circuit.

Aug. 24, 1987.

Guy W. Harrison, Mershon, Sawyer, Johnston, Dunwody & Cole, Charles C. Kline, Miami, Fla., for plaintiff-appellant.

Robert S. Ginsburg, Dade Co. Atty., R.A. Cuevas, Jr., Asst. Co. Atty., Miami, Fla., for defendants-appellees.

Before FAY and CLARK, Circuit Judges, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

The dispute in this case arises out of the award of· a federal construction contract for the electrified third rail of Miami's metropolitan transit system. Appellee, Metropolitan Dade County ("MDC") awarded the contract to the second lowest bidder, Transit Products, Inc. based upon an affirmative action plan. The low bidder, H.K. Porter, Inc., appellant, alleged that the affirmative action plan was unconstitutional. The district court awarded summary judgment to MDC. Finding no error, we affirm.

The facts and procedural history are set out in detail in this court's opinion, *H.K. Porter Co., Inc. v. Metropolitan Dade County*, 650 F.2d 778, 779–81 (5th Cir. 1981).[1] For the purposes of the immediate controversy, however, we here set forth a brief synopsis of the relevant facts.

On November 6, 1978, Congress passed the Surface Transportation Assistance Act of 1978 ("STAA"), Pub.L. No. 95–599, 92 Stat. 2689 (1978), which appropriated sums of federal money for the construction of highways and mass transportation systems. In the STAA legislative history, the House report of the Committee on Public Works and Transportation acknowledged a departmental initiative on behalf of the Department of Transportation ("DOT") to encourage the participation of minority business enterprises in the DOT's programs. H.R.Rep. No. 95–1485, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Admin.News 6575, 6647. To facilitate this initiative, grantees of STAA funds were required to establish written affirmative action plans which included percentage goals for minority business participation.

In 1979 MDC proposed to construct a rapid transit system for the metropolitan Miami area. Pursuant to the STAA, the Urban Mass Transit Administration ("UMTA") of the Department of Transportation ("DOT") would finance 80% of the costs of the project. MDC would contribute the remaining 20%. On December 30, 1977, DOT issued Circular 1165.1—a statement of DOT's policy and requirements for UMTA grant recipients. The circular stated that "It is UMTA policy that MBE's [minority business enterprises][2] shall have the maximum opportunity to participate in the performance of contracts financed in whole or in part with UMTA funds." The circular further stated that failure to follow UMTA policy could result in disqualification of grantee funds. Additionally, on March 6, 1978, DOT issued Order 4000.7A,[3]

---

1. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) this court adopted as precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

2. For the purposes of contract Y–621, a minority business enterprise was defined as: .

   a business enterprise that is owned and controlled by one or more socially or economically disadvantaged persons. Such disadvantage may arise from cultural, racial, chronic economic circumstances or background, or other similar cause. Such persons would include, but not be limited to, Blacks (not of Hispanic origin); Hispanics; Asians or Pacific-Islanders; American Indians or Alaskan Natives; and women, regardless of race or ethnicity.

3. Order 4000.7A stated in pertinent part:

   a. It is the policy of the Department of Transportation to encourage and increase the participation of businesses owned and controlled by minorities, including women, (MBEs) in contracts and projects funded by the Department. Economically and socially disadvantaged individuals, including minorities and women, have traditionally been underrepresented as owners and ˋmanagers of businesses in this country. The executive and legislative branches of the federal government have long recognized the need to promote the development of businesses owned by the economically and socially disadvantaged to achieve the goal of equal opportunity. To overcome the traditional

which re-emphasized the enforcement of DOT's MBE program. Both the circular and the order encouraged all grant recipients to establish percentage goals for MBE participation.

On June 10, 1979, MDC advertised for bids [4] from prime contractors interested in the electrified third rail to be used in the construction of the transit system under contract Y–621. Pursuant to STAA's initiative, MDC's bid invitation included a minority contractor provision which required each bidder to either (a) involve MBE's in 5% of the contract work or (b) demonstrate that it has made every reasonable effort to contract and negotiate with minority contractors in an attempt to achieve the stated

> underrepresentation of these groups in the business community, the federal government has used its procurement authority and its financial assistance programs to state and local governments as vehicles to assist minority business enterprises. Executive Order 11625 directs the Department of Commerce to provide technical and financial assistance to promote MBEs. Executive Order 11625 further requires that federal executive agencies develop comprehensive plans and programs to encourage minority business enterprise.
> b. The Department of Transportation is firmly committed to fulfilling its responsibilities under this Executive Order and to meet the goal of greater MBE participation in contracts and projects funded by the Department, although this may result in some increased cost to DOT. To this end, DOT is requiring each of its operating elements and all aid recipients and their contractors to make strong affirmative action efforts designed to set and meet goals for increasing MBE involvement. These efforts will encompass all aspects of the procurement of supplies, equipment, construction and services, including professional service contracts, concession contracts and bank deposits.
> c. The Department recognizes that meaningful gains in the level of MBE participation can be achieved only with energetic enforcement of this order and the commitment of all DOT employees, grantees and contractors to the goals of equal opportunity.

4. Contract Y–621's bidding requirements and procedures required each bidder, as part of its bid submission, to submit:

> a completed Schedule for Participation by Minority Contractor, listing those Qualified Minority Contractors with which the Bidder in-

goal. The bid invitation also contained a provision which allowed the bidder to demonstrate that it was unable to involve minority business, notwithstanding their efforts to contact and negotiate, because minority contractors were either not qualified to do the work required of the contract or because minority contractors were unavailable. The contract's Minority Contractor Participation Provision required each bidder to list the minority contractors the bidder intended to use if awarded the contract.

MDC received three bids for contract Y–621. The two lowest bids were received from Transit Products, Inc., ("Transit") and H.K. Porter ("Porter"). The bid from

> tends to contract for the performance of portions of the work under the Contract, specifying the agreed price to be paid to each such Minority Contractor for such work, identifying in detail the contract items or parts thereof to be performed by each such Minority Contractor, including a proposed timetable for the performance of each such contract item and providing other information as may be required by the Schedule. No work shall be included in the Schedule which the Bidder has reason to believe the listed Minority Contractor will subcontract, at any tier, to a non-Minority Contractor;
> a completed and signed Letter of Intent for each Minority Contractor listed in the Schedule;
> a completed and signed Minority Contractor Identification Statement of each Minority Contractor listed in the Schedule and for the Bidder if it is a Minority Contractor, but no Minority Contractor Identification Statement is required for any Minority Contractor named in the Minority Contractor List; and in the event the work listed on the Schedule is not sufficient to fulfill the stated goal, a statement by the Bidder of the reasons why it believes it is in compliance with this Provision and a list of the names, addresses and telephone numbers of the Minority Contractors contacted by the Bidder with respect to the performance of work under the Contract. The listing of a Minority Contractor by a Bidder on its Schedule shall constitute a representation by the Bidder that such Minority Contractor is Qualified and not Unavailable, and a commitment by the Bidder that if it is awarded the Contract it will enter into a subcontract with such Minority Contractor for the portion of the work and at the price set forth in its bid submission, subject to the terms of this Provision.

The bidding procedures further stated that "MDC shall not award a [c]ontract to any [b]id-

Transit was for $8,373,502 and the bid from Porter was for $8,076,506.30. However, Porter, rather than list the minority contractors it intended to use if awarded the contract, left the six pages in contract Y–621's Minority Contractor Participation Provision blank. Porter instead attached a letter stating that no minority firms produced the required materials and that Porter would therefore "follow the same plan and outlines that we have had approved on other transit programs." The bid submitted by Transit involved 5% minority contractor participation in compliance with contract Y–621's 5% MBE goal.[5] MDC decided, after extensive proceedings [6] both at the administrative level and in federal court, to accept the bid proposed by Transit, despite the fact that Porter's bid was lower since Porter's bid did not comply with the contract's MBE provisions. Porter was given a compliance hearing on November 28, 1979. At the compliance hearing Porter was asked by MDC's Compliance Officer, Dr. James Corbin, to explain why it had not complied with contract Y–621's bidding procedure of listing the minority contractors it had contacted in order to meet the 5% MBE goal. Porter responded by stating that it had made a recent investment in an in-house assembly plant in Chicago that totally assembled all the component parts of the electrified third rail. Porter stated that due to its in-house assembly plant, only four items from outside sources were necessary to produce the electrified rail.[7] Porter stated that no minority firms produced any of these four items. Porter testified that because of the nature of its in-house plant, it was "economically impracticable" to break down contract Y–621 in an attempt to subcontract to MBE's.

On December 10, 1979, MDC's Contracting Officer, John Dyer, opined to MDC's Board of County Commissioners that Porter's bid was not in compliance with the minority participation provisions of contract Y–621. On December 10, 1981, Porter brought the immediate action against MDC, and John Dyer, as the Contracting Officer. Porter's complaint alleged that MDC's 5% MBE goal was both unconstitutional on its face and as applied in violation of 42 U.S.C. §§ 1981, 1983, 2000d (1982) and 49 U.S.C. § 1615 (1982). Porter also contended that MDC and John Dyer acted in an arbitrary and capricious manner in denying contract Y–621 to Porter. Porter also alleged $1,510,544.00 in damages as a result of not being awarded the contract.

Both MDC and Porter filed cross-motions for summary judgment before the district court. The district court held a pretrial conference, allowing both parties to present their arguments. The district court ruled that MDC's bidding procedure for contract Y–621 was not unconstitutional and that MDC, in denying the contract to Porter did not act arbitrarily or capriciously. The district court granted summary judgment in favor of MDC and against Porter. Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Since we find that there is no genuine issue as to any material fact, we affirm.

## DISCUSSION

This case presents three issues: (1) whether the MBE program promulgated by the UMTA and MDC was violative of 42 U.S.C. § 2000d and 49 U.S.C. § 1615 thereby making the program unconstitutional on its face; (2) whether MDC acted unconstitutionally by employing a 5% MBE partic-

---

der which it determines fails to comply with the applicable requirements of this [p]rovision."

**5.** One of the minority firms Transit originally included in its bid for contract Y–621 was questioned by Porter as not being a bona fide MBE. Transit thereafter substituted a legitimate MBE, as it was allowed to do under contract Y–621's bidding procedure.

**6.** *See H.K. Porter,* 650 F.2d 778 (5th Cir.1981).

**7.** The General Manager of Porter's in-house assembly plant in Chicago, Mr. Gerhard O. Mietz, stated that contract Y–621 required four basic components: (1) steel rail, (2) aluminum extrusions, (3) a bolt holding the steel rail and aluminum together, and (4) oxide-inhibiting paste to be applied to aluminum and steel.

ipation provision in its bidding procedure for contract Y–621; and (3) whether MDC acted arbitrarily and capriciously in denying the award of contract Y–621 to Porter.

With respect to the facial unconstitutionality of MDC's MBE program, Porter argues that the UMTA did not have the authority to promulgate such a program because Congress has statutorily prohibited any and all UMTA-funded programs from employing affirmative action. 42 U.S.C. § 2000d (1982) provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Porter argues § 2000d, therefore, cannot be used to authorize the MBE program propounded by UMTA. 49 U.S.C. § 1615(a)(1) provides:

> (a)(1) No person in the United States shall on the grounds of race, color, creed, national origin, sex, or age be excluded from participation in, or denied the benefits of, or be subject to discrimination under any project, program, or activity funded in whole or in part through financial assistance under this chapter.

Accordingly, Porter argues, any use of racial, ethnic or sexual criteria in awarding contract Y–621 is facially violative of both 42 U.S.C. § 2000d and 49 U.S.C. § 1615. Although we agree with Porter that the use of racial, ethnic or sexual preferences as a basis to award government contracts appears to be contrary to the clear language of the statutes, we are constrained to follow the precedential mandates of the Supreme Court. The Supreme Court has recently stated, "[i]t is now well established that government bodies ... may constitutionally employ racial classifications essential to remedy unlawful treatment of racial or ethnic groups subject to discrimination." *United States v. Paradise*, ⸺ U.S. ⸺, ⸺, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987). In *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the Court held that Congress, in Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended 42 U.S.C. § 2000e et seq., left free both private unions and employers to voluntarily employ a collectively bargained plan that reserves for black employees 50% of the opening positions in an in-plant craft-training program until the percentage of black craftsmen in the plant is commensurate with the percentage of blacks in the local labor force. In *Weber*, the respondent argued that Congress intended in Title VII to prohibit all race-conscious affirmative action plans. Respondent's argument was based upon a literal interpretation of § 703(a) and (b) of Title VII. Those sections on their face make it unlawful to discriminate on the basis of race in the hiring and selection of apprentices for training programs. *Weber*, 443 U.S. at 201, 99 S.Ct. at 2726. In rejecting a literal interpretation of those statutes, the Court stated, "[i]t is a 'familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers.'" *Id.*, (quoting *Holy Trinity Church v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892)). The Court stated that the prohibition against discrimination contained in § 703(a) and (b) must be construed in light of the legislative history of the acts and the historical context in which the acts arose. *Id.*

In *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the Supreme Court upheld the facial constitutionality of a similar federally funded project, which included a similar MBE provision. In *Fullilove*, Congress had enacted the Public Works Employment Act of 1977, 42 U.S.C. §§ 6701–6736, which authorized $4 billion dollars for federal grants made by the Secretary of Commerce to state and local governmental entities for use in local public work projects. Section 103(f)(2) of the Act, the MBE provision, required at least 10% of any local works project to be set aside for minority business enterprises. In upholding the constitutionality of the MBE provision as a legitimate remedial congressional objective, the Court stated

that, "[t]he legislative objectives of the MBE provision must be considered against the background of ongoing efforts directed toward deliverance of the century-old promise of equality of economic opportunity." *Fullilove*, 448 U.S. at 463, 100 S.Ct. at 2767.

■ Therefore, we here analyze the prohibitions against discrimination contained in § 2000d and 49 U.S.C. § 1615(a)(1) in light of the legislative and historical context in which the acts arose. An examination of the legislative and historical background giving rise to the promulgation of § 2000d and § 1615(a)(1) clearly indicates that Congress was addressing the need to ensure that minority business firms would be provided with a fair opportunity to participate in federally-funded government contracts. Indeed, in § 1615(a)(2) of the Act, Congress delegated to the Secretary of Transportation the responsibility to take affirmative action to assure compliance with Congress' determination that minorities were not fully participating in public contracts at the federal, state, and local level.

Here we deal, as we noted earlier, not with the limited remedial powers of a federal court, for example, but with the broad remedial powers of Congress. It is fundamental that in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees. Congress not only may induce voluntary action to assure compliance with existing federal statutory or constitution antidiscrimination provisions, but also, where Congress has authority to declare certain conduct unlawful, it may, as here, authorize and induce state action to avoid such conduct.

*Fullilove*, 448 U.S. at 483–84, 100 S.Ct. at 2777. Thus we conclude that in this case the UMTA had the authority, pursuant to

the clear and strong Congressional mandate, to promulgate the MBE program relative to contract Y–621.

Porter also argues, however, that the MBE provisions of contract Y–621 were unconstitutional as applied. Porter's argument is grounded solely in Porter's interpretation of this court's opinion in *South Florida Chapters of Associated Contractors of America v. Metropolitan Dade Co.*, 723 F.2d 846 (11th Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984). Porter alleges that the MBE provisions of contract Y–621 were unconstitutionally applied because the authorities failed to follow the three "common concerns" enunciated in *South Florida*. *Id.*, at 851–52. Porter argues that *South Florida* provides "a clear and detailed blueprint" for evaluating all minority preference programs. We think Porter's reliance on *South Florida* is misplaced. *South Florida* involved the constitutionality of a county ordinance and resolution granting to black contractors preferential treatment in the county's bidding process. *South Florida*, 723 F.2d at 847–48. In *South Florida* the Dade County Commission, in response to the May 1980 disturbances in Liberty City, passed an ordinance which operated to waive altogether the formal contract bidding process and to grant to black contractors the exclusive right to bid on the construction projects of the county. The ordinance also contained a sub-contractor's provision requiring that fifty percent of the dollar value of any county contract be awarded to black sub-contractors. *Id.*, at 848–49. The ordinance was challenged both facially and as applied to the county construction project for the Earlington Heights Metro-rail Station.[8] *Id.* at 848.

In analyzing the constitutionality of the race-conscious legislation, this court, "[w]ithout adopting a formal 'test,'" *South Florida*, 723 F.2d at 852, articulated what it construed to be the three common concerns to the various views of the Supreme Court in *Regents of the Univ. of Califor-*

---

**8.** The Earlington Heights Metrorail Station is one of the metrorail stations located in Dade County.

*nia v. Bakke,* [9] 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), and *Fullilove,* 448 U.S. 448, 100 S.Ct. 2758: "(1) that the governmental body have the authority to pass such legislation; (2) that adequate findings have been made to ensure that the governmental body is remedying the present effects of past discrimination rather than advancing one racial or ethnic group's interest over another; and (3) that the use of such classifications extend no further than the established need of remedying the effects of past discrimination." *South Florida,* 723 F.2d at 851–52. These common concerns were set forth merely as safeguards to be used by a reviewing court in analyzing *"[l]egislation employing benign racial preferences." Id.,* (emphasis supplied). We therefore reject Porter's contention that *South Florida* provides federal courts with a detailed set of mandatory guidelines with which to analyze the constitutionality of any and all MBE programs.

Moreover, the Supreme Court has set forth a two-prong test to be applied in situations wherein preferential classifications are based upon racial and ethnic distinctions. *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, ——, 106 S.Ct. 1842, 1846, 90 L.Ed.2d 260 (1986). In *Wygant,* the Court was called upon to decide the constitutionality of whether a school board could, consistent with the Equal Protection Clause, extend preferential employment protection to certain employees solely because of their race or ethnic origin. *Wygant,* 106 S.Ct. at 1844. The Court stated the classifications operated "against whites and in favor of certain minorities, and therefore constitutes a classification based on race." *Id.* at 1846. The Court went on to state such classifications must be justified by a compelling government interest. *Id.* Secondly, the means chosen to effectuate this interest or purpose must be narrowly tailored to the achievement of that

goal. *Id.* (citing *Fullilove,* 448 U.S. at 480, 100 S.Ct. at 2775).

In addition, the Court has recently set forth factors to be considered in analyzing the appropriateness of race-conscious remedies. *Paradise,* 107 S.Ct. at 1067. These factors include, "the necessity for the relief and the efficacy of alternative remedies, the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *Id.* We will therefore analyze the constitutionality of contract Y–621's MBE provision under the test set forth in *Wygant* while also considering the factors articulated in *Paradise.*

■ We have noted that MDC, in implementing the MBE provisions of contract Y–621, was acting pursuant to Congress' compelling interest in eradicating the continuing effects of past discrimination against minorities in the participation of government contracts. *See Fullilove,* 448 U.S. at 497, 100 S.Ct. at 2784 (Powell, J., concurring); Further, the Supreme Court has recently made it clear that "[t]he government unquestionably has a compelling interest in remedying past and present discrimination by a state actor." *Paradise,* 107 S.Ct. at 1065. Congress' determination to foster greater MBE participation in government contracts was due, in part, to the fact that other potential possible remedies had proven unsuccessful. *See Fullilove,* 448 U.S. at 511, 100 S.Ct. at 2791 (Powell, J., concurring).

As for the duration of the relief, there is nothing in the record to suggest that MDC's bidding procedure for contract Y–621, including the MBE provision, was anything more than a temporary remedy. It was simply an absolute condition MDC had to meet to receive federal funds through the UMTA in order to finance the construc-

---

9. *Regents of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) was the Supreme Court's first direct confrontation with affirmative action programs. Petitioner Bakke challenged an admission program of the Univer- sity of California's Davis Medical School, whereby sixteen of one hundred spaces available for the entering class were set aside solely for minority applicants. The case produced no majority, however, five justices held the quota invalid.

tion of the metrorail system. This procedure, being temporary, was not a policy of MDC to maintain a racial or ethnic balance, but was rather intended by Congress to eliminate a manifest racial and ethnic imbalance. *See Weber,* 443 U.S. at 208, 99 S.Ct. at 2729. Indeed, this particular program ended when the construction for contract Y–621 was completed. MDC's bidding procedure for contract Y–621 also contained a waiver provision which operated to excuse the bidder from contracting or subcontracting with MBE's if the bidder demonstrated that it had made every reasonable effort to contact and negotiate with MBE's, but was unable to achieve the 5% goal despite such efforts due to the fact that minority contractors were not qualified or not available. *See Fullilove,* 448 U.S. at 487, 100 S.Ct. at 2779 (significant that an administrative scheme provides waiver mechanism under MBE program).

We next consider whether the 5% goal implemented by MDC in connection with contract Y–621 is sufficiently narrowly tailored to achieve the stated goal of fostering greater minority participation in government contracts. *See Paradise,* 107 S.Ct. at 1064–74; *Wygant,* 106 S.Ct. at 1846. In *Wygant,* the Supreme Court decided a case involving constitutional implications analogous to the constitutional questions presented in this case. *Id.* at 1844. As we noted earlier in *Wygant,* the Court was called upon to decide whether a school board could, consistent with the equal protection clause, extend preferential employment protection against layoffs to its employees solely because of their race or national origin. *Wygant,* 106 S.Ct. at 1844. In *Wygant,* community racial tensions prompted the Jackson Board of Education to include a layoff provision in the collective bargaining agreement between the Board of Education and the Jackson Education Association that operated to lay off tenured non-minority teachers while allowing minority teachers on probationary status to be retained. *Id.,* 106 S.Ct. at 1844–45. When layoffs became necessary the Board retained the tenured non-minority teachers, thus refusing to follow the layoff provision of the collective bargaining

agreement. *Id.,* 106 S.Ct. at 1845. The Jackson Education Association, along with two minority teachers who had been discharged, alleged the Board's failure to adhere to the layoff provision violated the equal protection clause of the fourteenth amendment and Title VII of the Civil Rights Act of 1964. *Id.* On cross motions for summary judgment, the district court, *inter alia,* dismissed the claims holding "that the racial preferences granted by the Board need not be grounded on a finding of prior discrimination." *Id.,* at 1846. The Court of Appeals for the Sixth Circuit affirmed. *Id.* The Supreme Court reversed holding that the layoff plan was not sufficiently narrowly tailored, *inter alia,* because the plan was not supported by finding of past discrimination. *Id.,* at 1846–52. The court pointed out that "some showing of prior discrimination by the governmental unit involved" must be demonstrated before allowing even a limited use of racial and ethnic classifications in order to remedy prior discrimination. *Id.* at 1847.

■ Porter argues that since Congress delegated to MDC the actual implementation of contract Y–621's MBE provision, MDC was required to make detailed and specific findings concerning past discrimination. We disagree. As indicated, MDC in implementing the MBE provisions of contract Y–621, was relying on Congress' legislative findings which clearly established that minorities were not participating in government contracts. *See Fullilove,* 448 U.S. at 478, 100 S.Ct. at 2774. Indeed, Congress' findings led the STAA to require that minority percentage goals be established as an absolute condition precedent to the receipt of federal funds. We hold that under the circumstances of this case, MDC was not constitutionally required to make additional findings of past discrimination regarding the awarding of this contract. Congress was concerned about a national problem. Its findings provide adequate support for such local projects.

Porter argues, nevertheless, that the 5% MBE goal in contract Y–621 is not narrowly tailored and thus unconstitutional as ap-

plied because the goal was not based upon a study or investigation of the availability of qualified MBE's to participate in contract Y–621. The record does not suggest that MDC conducted such detailed studies regarding past discrimination against MBE's in the awarding of construction contracts or investigations regarding the availability of MBE's qualified to participate in contract Y–621.[10] We must concede that we are troubled by MDC's decision to use the 5% figure without supporting or substantiating the figure with some sort of consideration of the 5% goal to the relevant labor market of MBE's available to participate in contract Y–621. *See Paradise,* 107 S.Ct. at 1071. We share the Supreme Court's concern with racial and ethnic factors when used as a basis for affirmative action programs. *See Wygant,* 106 S.Ct. at 1847. ("Any preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees." *Wygant,* 106 S.Ct. at 1846 (quoting *Fullilove,* 448 U.S. at 491, 100 S.Ct. at 2781). Opinion of Burger, C.J.). However, federal courts have upheld affirmative action programs utilizing figures much higher than the modest 5% figure MDC implemented in this case. As noted, the Supreme Court in *Fullilove,* approved the use of a 10% MBE goal as sufficiently narrowly tailored to be a constitutionally acceptable means of redressing the present effects of past discrimination. *Fullilove,* 448 U.S. 448, 100 S.Ct. 2758. In *Weber,* the Court held Title VII did not prohibit an affirmative action plan collectively bargained between the United Steelworkers of America and Kaiser Aluminum & Chemical Corporation which reserved for black employees 50% of the opening positions in a sought after training program. *Weber,* 443 U.S. at 208–09, 99 S.Ct. at 2729–30. The Court in *Paradise,* 107 S.Ct. at 1067–74, upheld a one-black-for-one-white race conscious promotional requirement within the Alabama Depart-

ment of Public Safety imposed by the district court as being sufficiently narrowly tailored to remedy past discrimination. It is also significant that MDC's implementation of this affirmative action program does not unnecessarily trammel the interest of non-minority contractors or sub-contractors, and thus does not impose an unacceptable burden on innocent third parties. *See Paradise,* 107 S.Ct. at 1073; *Weber,* 443 U.S. at 208, 99 S.Ct. at 2729. All that was required by Porter was that Porter demonstrate that it had made every reasonable effort to meet the 5% MBE provision, or demonstrate that it was unable to do so despite such efforts because minority contractors were not qualified or were not available. Further, the record reflects that MDC's decision to deny the award of contract Y–621 to Porter was not based solely on Porter's failure to meet the 5% MBE goal. The decision was also based on Porter's failure to make any effort to attempt to locate and contract or sub-contract with MBE's. The district court, in granting summary judgment against Porter, noted that Porter did not contact a single MBE, other than its already existing suppliers. We agree with MDC and the district court's conclusion that Porter has not demonstrated that it made every reasonable effort to attempt to locate and contract or sub-contract with MBE's. The district court concluded that the MBE provision of contract Y–621 was not unconstitutional. After our own examination of the record, taking into consideration the particular facts of this case and the relevant case law, we hold that MDC's use of a 5% MBE goal in contract Y–621 is not unconstitutional.

Porter's last argument is that MDC acted arbitrarily and capriciously in denying the award of the contract to Porter. Having held that MDC's bidding procedure for contract Y–621 is constitutional, this argument is without merit.

AFFIRMED.

---

**10.** MDC in fact proffered studies allegedly supporting the determination of a 5% MBE goal for contract Y–621 at the district court, however, the district court did not allow the proffered studies into evidence. MDC has not cross-appealed this ruling. Thus, no such studies appear in the record for our consideration.