**H.K. PORTER COMPANY, INC.,**
Plaintiff–Appellant,

v.

**METROPOLITAN DADE COUNTY, John Dyer, individually and as Contracting Officer for Metropolitan Dade County,**
Defendants–Appellees.

No. 90–5678.

United States Court of Appeals,
Eleventh Circuit.

Oct. 2, 1992.

Charles C. Kline, Miami, Fla., for plaintiff-appellant.

Robert A. Cuevas, Jr., Asst. County Atty., Miami, Fla., for defendants-appellees.

Before HATCHETT and EDMONDSON, Circuit Judges, and HILL, Senior Circuit Judge.

EDMONDSON, Circuit Judge:

This case involves the Surface Transportation Assistance Act of 1978 ("STAA"), Pub.L. 95–599, 92 Stat. 2689 (1978). The question presented is whether a local government's minority set-aside program can withstand constitutional attack in the absence of investigation by the local government into past discrimination when the STAA did not specifically call for minority set-asides. The answer is "no."

The dispute in this case arises out of the award of a federal construction contract ("contract Y–621") for the electrified third rail of Miami's Metrorail system. The estimated costs for contract Y–621 were several million dollars. The Urban Mass Transit Administration ("UMTA") of the Department of Transportation ("DOT") financed most of these costs through a federal grant, and Metropolitan Dade County ("Dade County") contributed the remainder. Dade County required bidders on contract Y–621 either to involve minority business enterprises ("MBEs") in 5% of the contract work or to demonstrate that the bidders made every reasonable effort to include such businesses. Dade County says it included the minority set-aside requirements in contract Y–621 in response to an UMTA Circular[1] and a DOT Order.[2] The UMTA Circular and DOT Order required grantees of UMTA-funded projects to adopt programs that insure that MBEs have equitable opportunities for participating in UMTA contracts.[3]

Appellant, H.K. Porter ("Porter"), was the low bidder on contract Y–621; Porter's

---

1. UMTA Circular 1165.1, UMTA Interim Minority Business Enterprise Policy and Requirements for Grant Recipients (December 30, 1977).

2. DOT Order No. 4000.7A, Minority Business Enterprise Program (March 16, 1978).

3. The STAA, in which Congress appropriated federal money for the construction of highways and mass transportation systems, is the source of the grant for Miami's Metrorail system. The STAA seems to provide the authorization for DOT's minority business program. *See infra* note 7.

bid forms demonstrating compliance with the County's minority set-aside requirements were left blank.[4] The second lowest bidder submitted forms indicating that it would meet the 5% minority subcontracting requirement. The second lowest bidder objected to Porter's bid, for its failure to comply with contract Y–621's set-aside requirements. In turn, Porter filed an action in district court to compel the County to conduct an administrative hearing on Porter's bid. The district court entered summary judgment and ordered Dade County to conduct an administrative hearing to determine whether Porter's bid complied with the County's set-aside requirements. After conducting the required hearing, the County's contracting officer found that Porter's bid did not comply and recommended award to the second lowest bidder. The district court also found that Porter had not made reasonable efforts to contract and to negotiate with MBEs and concluded that Porter's bid did not comply with the pertinent set-aside requirements. Dade County then awarded the contract to the second lowest bidder. Because Porter had claimed no damages, but had only sought injunctive relief against the award of the contract, and because the contract had since been awarded, we dismissed an appeal to us as moot. *H.K. Porter Co. v. Metropolitan Dade County*, 650 F.2d 778 (5th Cir.1981).

Porter then filed a second lawsuit, claiming that the 5% minority set-aside in contract Y–621 was unconstitutional. This time, Porter sought damages as a result of not receiving the contract award. The district court concluded that the bidding procedure had been constitutional. Relying on the precedent of *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), in which the Supreme Court ap-

proved the use of a 10% MBE set-aside mandated by Congress, we affirmed the district court's summary judgment ruling. *H.K. Porter Co. v. Metropolitan Dade County*, 825 F.2d 324, 332 (11th Cir.1987) (*Porter II*).

The Supreme Court then granted certiorari, vacated the judgment, and remanded the case for further consideration in the light of *Richmond v. J.A. Croson Company*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).[5] We remanded to the district court to develop the record on how Dade County had derived the 5% minority set-aside for contract Y–621. In the light of the evidence presented, and upon consideration of *Croson* and the more recent decision, *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), the district court reaffirmed its earlier judgment in defendant's favor. *H.K. Porter Co. v. Metropolitan Dade County*, No. 81–2766 (S.D.Fla. July 13, 1990). This appeal followed. We reverse.

## DISCUSSION

The Supreme Court's precedents have applied different levels of scrutiny to "affirmative action" programs of federal, state, and local governments. According to *Croson*, if a state or local government has developed a minority set-aside, a court must strictly scrutinize the program. Under *Fullilove*, however, if Congress has expressly mandated such a program, then a more lenient standard, resembling intermediate scrutiny, is applicable.

When *Porter II* was written, only *Fullilove* was in existence. In *Porter II* we did not explicitly evaluate the case under an "intermediate scrutiny" standard, but we did note that Dade County "in implementing the MBE provisions of contract Y–621,

---

**4.** Instead, Porter attached a letter, written by R.E. Lillard, Manager of Transit Programs for Porter. The letter stated that no minority subcontractor could do the work required for the Metrorail third-rail contract.

**5.** The Supreme Court's decision on the issue of minority subcontracting in *Croson*, where it reviewed the City of Richmond's attempt to create a 30% minority set-aside, was markedly differ-

ent than it had been in *Fullilove*. Briefly stated, the Court in *Croson* applied the strict scrutiny standard, requiring the City to have made particularized findings of earlier discrimination in the industry and within the geographic area affected, and requiring that the minority set-aside would be narrowly tailored to go no further than necessary to remedy the present effects of prior discrimination.

was relying on Congress' legislative findings which clearly established that minorities were not participating in government contracts." *Porter II*, 825 F.2d at 331. As a result, we held that under the circumstances of the case, Dade County was not constitutionally required to make additional findings of past discrimination for its MBE program. *Id.*

■ But *Porter II* was vacated by the Supreme Court and no longer has authority. *See H.K. Porter Co. v. Metropolitan Dade County*, 489 U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989). The Supreme Court remanded the *Porter* case for reconsideration in the light of *Croson. Id. Croson* compels us to examine the enabling statute—in this case, the STAA—to see whether it requires state or local government development of minority set-asides. Under *Croson*, as we stated earlier, if a state or local government has created a minority set-aside program that was neither mandated nor specifically approved by Congress, a court must strictly scrutinize the program.[6]

■ In the present case, neither Congress nor the DOT specified a certain percentage minority set-aside. Congress in the STAA makes no mention of set-asides at all; instead, the Act just says that "affirmative action" should be taken to insure that no person is denied the benefits of or is subject to discrimination under the Act. Therefore, although "Congress' legislative findings" inspired Congress to include the affirmative action language in the STAA,[7] there was no express percentage set-aside requirement, as in *Fullilove*.[8] Instead, the state or local government involved in the project decides the appropriate kind of affirmative action policy.[9]

6. Dade County says that the STAA's statutory language is similar to that of the Airport and Airway Development Act of 1970 ("AADA") which was recently at issue in *S.J. Groves & Sons Co. v. Fulton County*, 920 F.2d 752, 764 (11th Cir.1991). *S.J. Groves* was mainly about federal preemption of state laws. In remanding the case to district court for a further look at the preemption question, we said that certain DOT regulations for increasing minority business participation in construction projects were subject only to intermediate scrutiny because the AADA, a congressional act, authorized the regulations. But we did not reach or decide whether the AADA or its regulations did command the pertinent local government to include in its federally-required affirmative action program the minority set-aside requirement that was involved in *S.J. Groves*. We do not here address the constitutionality of the pertinent UMTA Circular or DOT Order; we assume they are valid. We are looking directly at Dade County's acts.

7. The STAA in pertinent part reads:
(a)(1) General—No person in the United States shall on the grounds of race, color, creed, national origin, sex or age be excluded from participation in, or denied the benefits of, or be subject to discrimination under any project, program, or activity funded in whole or in part through financial assistance under this Act. The provisions of this section shall apply to employment and business opportunities and shall be considered to be in addition to and not in lieu of the provisions of Title VI of the Civil Rights Act of 1964.
(2) Affirmative Action—The Secretary shall take affirmative action to assure compliance with subsection (a)(1) of this section.

49 U.S.C.A.App. § 1615.

8. This case is also different from *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), relied on by the dissent. In *Metro*, the Court stressed that the FCC's minority ownership programs were "specifically approved—indeed, mandated—by Congress," and thus held that the Court owed deference to Congress' judgment. *Id.* 497 U.S. at ——, 110 S.Ct. at 3008. The Court noted that Congress specifically required the FCC, through appropriations legislation, to maintain its minority ownership policies without alteration. *Id.* 497 U.S. at ——, n. 9, ——, 110 S.Ct. at 3006 n. 9, 3013. In other words, Congress legislated severe financial repercussions if the FCC did not follow Congress' express desire to keep intact the minority ownership policies. Congress' call for "affirmative action" in its STAA legislation was far less specific.

9. Dade County argues that it is not required by *Croson* to have made its own findings of discrimination to establish a minority set-aside program. At first glance, it appears that many post-*Croson* courts agree with Dade County. *See Ellis v. Skinner*, 961 F.2d 912 (10th Cir. 1992); *Tennessee Asphalt Co. v. Farris*, 942 F.2d 969 (6th Cir.1991); *Milwaukee County Pavers Assn. v. Fiedler*, 922 F.2d 419 (7th Cir.1991); *Michigan Rd. Builders Assn. v. Blanchard*, 761 F.Supp. 1303 (W.D.Mich.1991); *Harrison and Burrowes Bridge Constructors, Inc. v. Cuomo*, 743 F.Supp. 977 (N.D.N.Y., 1990). These courts held that *Fullilove* requires no additional local findings of discrimination by participants in federal-state programs. Each of these cases, however, is easily distinguishable on one important basis. The provisions under review in

Congress' call for affirmative action—that is, encouragement of increased representation of women and minority groups—is not synonymous with specific approval of the use of minority set-aside requirements. The UMTA Circular and DOT Order require goals for minority participation.[10] But the UMTA Circular and DOT Order do not dictate a specific percentage set-aside, although they provide that some kind of set-aside "may be established" if "allowable under local law and appropriate to meet MBE goals." UMTA Circular 1165.1, at 8; *accord* DOT4000.7A, at 6. What the local law in Dade County can allow, in the light of the federal constitution, is the issue here.[11]

■ In *Cone Corp. v. Hillsborough County*, 908 F.2d 908 (11th Cir.1990), we said, following *Croson*, that a county minority set-aside plan must be based upon "particularized" findings of earlier discrimination in the affected industry:

> [A]t a base minimum, any plan must have more than an amorphous claim that there has been discrimination in a particular industry. Where plans establish quotas, the quotas must be tied to some injury suffered by the minority to be benefitted.

these cases involved a specific 10% set-aside expressly mandated by Congress.

**10.** As we read the Circular and Order, "goals" and "set-asides" are different things. "Goal" means an aspirational target. We understand a "set-aside" to be one of several possible means that might be used for reaching the goal.

**11.** The DOT and the UMTA never purport to make local government acts on minority set-asides, that would otherwise be unallowed, allowable or appropriate. Dade County could have attempted to meet the UMTA goal requirements without instituting a program that sets aside contracts for minority businesses that are not the lowest bidders or least expensive providers of the desired services. Even without a finding of historical discrimination, Dade County could have pursued many other avenues to meet its affirmative action goals, such as making an extra effort to notify minority businesses of bidding opportunities.

**12.** In *Cone*, we reversed the district court's entry of summary judgment against the County based on its set-aside program. We specifically noted that "the County MBE law was not the result of some vague government desire to right past

*Cone*, 908 F.2d at 913–14. *Cone*, because it involved a local government entity, required strict scrutiny review. *Id.* at 913. Therefore, it is clear that at least some kind of finding of earlier discrimination in the affected industry in the area is necessary before a local government—as opposed to Congress—may adopt a race-conscious program that sets aside certain work for minorities. *Id.* ("[P]roponents of MBE laws ... must be able to show that there were actually instances of past discrimination, that the MBE plan is necessary to remedy the discrimination, and that the plan is narrowly tailored to that goal.").[12] A local MBE program that asserts percentage set-asides without reference to past discrimination cannot be tailored to remedying that discrimination.

■ When Dade County created the 5% minority set-aside, the County undertook no investigation to determine the degree to which anyone was actually either being (or had been) denied benefits or being (or had been) discriminated against in the pertinent contract's specified industry.[13] Therefore, the County did not know whether there was earlier discrimination or the extent of discrimination.[14] Because Dade County had no knowledge of earlier discrimination

wrongs. The law resulted from prolonged studies of the local construction industry that indicated a continuing practice of discrimination." *Cone*, 908 F.2d at 915.

**13.** *Cf. Croson*, 488 U.S. at 504, 109 S.Ct. at 727 ("Congress has made national findings that there has been societal discrimination in a host of fields. If all a state or local government need do is find a congressional report on the subject to enact a set-aside program, the constraints of the Equal Protection Clause will, in effect, have been rendered a nullity.").

**14.** The facts to which Judge Hatchett refers in his dissent deal with the County's investigation into the availability of minorities to perform work on contract Y–621. But we are writing about the County's investigation into historical discrimination. As we understand the record, the County conceded that "no official of the County ... conducted an investigation or made a finding that persons defined in the contract as 'minority persons' had suffered past discrimination in the awarding of contracts such as Contract Y–621." *See* Plaintiff's First Request for Admissions, R. Vol. 9, doc. no. 85, ¶ 57; Defen-

in its area in the industry, we cannot justify the County's program as a tailored effort to remedy past discrimination.[15] So, the set-aside was not allowable.

Our decision today is not about what we personally think might be good public policy. It is about what Congress said and did not say in the STAA and about what the Supreme Court has said in *Fullilove, Croson* and *Metro Broadcasting* about Congress' special place as policymaker on the important subject of minority set-asides. We stress that Dade County's minority set-aside was neither approved nor mandated by Congress, not in general terms and certainly not in terms of a specific numerical set-aside. Because of the failure to tailor its 5% set-aside even to rough findings of earlier discrimination in the area, Dade County's set-aside discriminates unconstitutionally.[16] Therefore, the judgment of the district court is REVERSED.

HATCHETT, Circuit Judge, dissenting:

We must remember why this case is again before the court. Metropolitan Dade County's MBE plan has been subjected to numerous reviews—the compliance monitor, the contracting officer, the Urban Mass Transportation Administration's ("UMTA") Atlanta Regional Office, UMTA's Washington office, and the Dade County Commission. Further, the district court has addressed the plan's constitutionality on three occasions, and we have reviewed the plan on two prior occasions. Throughout all these reviews, the plan has been found constitutional. As the majority notes, this case is before the court a third time for consideration in light of the Supreme Court case, *Richmond v. J.A. Croson*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

The last time we reviewed this case, we upheld Dade County's MBE plan, finding that under an intermediate level analysis, the plan was constitutional on its face and as applied to Porter. *H.K. Porter Co. v. Metropolitan Dade County*, 825 F.2d 324, 331 (11th Cir.1987) (*Porter II*). In *Porter II*, we stated:

Porter argues that since Congress delegated to [Metropolitan Dade County ("MDC")] the actual implementation of contract Y–621's MBE provision, MDC was required to make detailed and specific findings concerning past discrimination. We disagree. As indicated, MDC in implementing the MBE provisions of contract Y–621, was relying on Congress' legislative findings which clearly established that minorities were not participating in government contracts. *See Fullilove*, 448 U.S. at 478, 100 S.Ct. at 2774.... We hold that under the circumstances of this case, MDC was not constitutionally required to make additional findings of past discrimination regarding the awarding of this contract. Congress was concerned about a national problem. Its findings provide adequate support for such local projects.

*Porter II*, 825 F.2d at 331.

*Croson* and the more recent *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), have absolutely no effect on this court's prior ruling concerning the constitutionality of Dade County's MBE plan. In *Croson*, the Court held that a strict level of scrutiny should be applied to *state* or *local* public minority preference programs. In *Metro Broadcasting*, the Court stated:

A majority of the Court in *Fullilove* did not apply strict scrutiny to the race-based classification at issue. Three

dant's Response to Plaintiff's First Request for Admissions, R. Vol. 9, doc. no. 85, ¶ 15.

**15.** No need exists to remand this case for further factual findings. From the record before us, it is clear that the County made no investigation into past discrimination before creating the 5% minority set-aside. Because we hold that the County constitutionally was obligated to investigate past discrimination before adopting the race-conscious measure, nothing that the

County would say at any further hearing would be of consequence to the particular set-aside program at issue in this case.

**16.** Given our determination that Dade County's inquiry into historical discrimination was completely inadequate, we need not reach the issue of whether the 5% goal reflects the numbers of minority subcontractors who are available to perform subcontracting work on the Miami Metrorail contract.

Members inquired 'whether the objectives of the legislation are within the power of Congress' and 'whether the limited use of racial and ethnic criteria ... is a constitutionally permissible means for achieving the congressional objectives.' [Citations omitted.] Three other Members would have upheld benign racial classifications that 'serve important governmental objectives and are substantially related to achievement of those objectives.' [Citations omitted.] We apply that standard today. We hold that benign race-conscious measures mandated by Congress—even if those measures are not 'remedial' in the sense of being designed to compensate victims of past governmental or societal discrimination—are constitutionally permissible to the extent that they serve important governmental objectives within the power of Congress and are substantially related to achievement of those objectives.

*Metro Broadcasting*, 497 U.S. at ——, 110 S.Ct. at 3008, 111 L.Ed.2d at 462–63. The Court further stated:

Our decision last Term in *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) concerning a minority set-aside program adopted by a municipality, does not prescribe the level of scrutiny to be applied to a benign racial classification employed by Congress. As Justice Kennedy noted, the question of congressional action was not before the Court, and so *Croson* cannot be read to undermine our decision in *Fullilove*. In fact, much of the language and reasoning in *Croson* reaffirmed the lesson of *Fullilove* that race-conscious classifications adopted by Congress to address racial and ethnic discrimination are subject to a different standard than such classifications prescribed by state and local governments.

*Metro Broadcasting*, 497 U.S. at ——, 110 S.Ct. at 3009, 111 L.Ed.2d at 463.

The majority attempts to distinguish *Metro Broadcasting* from the present case by noting that the FCC minority ownership programs involved in *Metro* were " 'mandated—by Congress' " and that "Congress legislated severe financial repercussions if the FCC did not follow Congress' express desire to keep intact the minority ownership policies." Majority Op. at 105, n. 8 (citation omitted). These alleged distinctions are unavailing.

In reaching its result, the majority ignores the entity that mandated the minority set aside goal in this case. Here, it is clear that Congress mandated Dade County's MBE program. In *Porter II*, this court concluded that "the UMTA had the authority, pursuant to the *clear and strong Congressional mandate*, to promulgate the MBE program relative to contract Y–621." 825 F.2d at 329 (emphasis added). Moreover, the Surface Transportation Assistance Act (STAA) includes a compliance provision. Under this provision, when a person receiving funds pursuant to the STAA does not comply with its Affirmative Action provision,

the Secretary shall—(i) direct that no further Federal financial assistance under this Act be provided to such person; (ii) refer the matter to the Attorney General with a recommendation that an appropriate civil action be instituted; (iii) exercise the powers and functions provided by title VI of the Civil Rights Act of 1964 [citation omitted]; or (iv) take such actions as may be provided by law.

STAA, Pub.L. 95–599, 92 Stat. 2750 (1978). Therefore, the majority's argument that this case can be distinguished from *Metro Broadcasting* based upon the entity that mandated the plan, and penalties for plan noncompliance is wrong.

When Congress passed the STAA, it encouraged MBE participation in DOT programs. In fact, the STAA required entities receiving funds to establish an affirmative action plan with MBE participation percentage goals. The legislative history of the STAA concerning the use of MBEs provided:

The Committee is aware that [the] Secretary of Transportation ... issued a major Departmental initiative to encourage participation by minority businesses in DOT's programs. Among the mechanisms provided in the new order are re-

quirements that the operating elements within DOT establish percentage goals for minority utilization, and that DOT grantees prepare written affirmative action plans that include goals, and when allowed by state law, provision under appropriate circumstances for set-asides limited for bidding to minority firms.... The Committee supports this strong action by the Secretary and encourages vigorous efforts to carry out the spirit and intent of the new Departmental Order.

Pub.L. No. 95–599, 1978 U.S.C.C.A.N. pp. 6575, 6647. Thus, when Dade County applied for and received an UMTA grant, federal law compelled it to include the minority participation provision in order to receive the federal funds.

In addition, both UMTA and Department of Transportation ("DOT") requirements provided the bases for the minority plan. The UMTA circular required the county to establish goals "related to the availability of MBEs" and to attempt "to match proposed procurements with available qualified MBEs." The DOT order directed the county "to require that participating MBEs be identified by name when bids or proposals are submitted." Because the MBE plan was subject to federal government approval, Dade County was acting as an agent for the federal government in eliminating discriminatory awards in partially federally funded construction contracts. Because Congress mandated the minority set aside program, a *Fullilove*, intermediate standard is appropriate.

The majority correctly notes that many courts have held that *Fullilove* requires no additional local findings of discrimination by participants in federal-state programs. *See Ellis v. Skinner*, 961 F.2d 912 (10th Cir.1992); *Tennessee Asphalt Co. v. Farris*, 942 F.2d 969 (6th Cir.1991); *Milwaukee County Pavers Assn. v. Fiedler*, 922 F.2d 419 (7th Cir.1991); *Michigan Rd. Builders Assn., Inc. v. Blanchard*, 761 F.Supp. 1303 (W.D.Mich.1991); *Harrison and Burrowes Bridge Constructors, Inc. v. Cuomo*, 743 F.Supp. 977 (N.D.N.Y., 1990). The majority, however, dismisses the applicability of this legal premise on the simple technicality

that the STAA did not specify a particular percentage of business that should be set aside for MBEs. This rationale trivializes not only the congressional intent of minority set aside goals, but also violates the spirit and purpose of these programs.

Instead of adopting the holdings from other circuits, the majority holds that Congress did not mandate the MBE program in this case. I disagree. As the Seventh Circuit noted in *Fiedler:*

> The joint lesson of *Fullilove* and *Croson* is that the federal government can, by virtue of the enforcement clause of the Fourteenth Amendment, engage in affirmative action with a freer hand than states and municipalities can do. *And one way it can do that is by authorizing states to do things that they could not do without federal authorization.*

*Fiedler*, 922 F.2d at 423–24 (emphasis added). Although Congress left the development of the MBE plan to the DOT, UMTA, and, under their auspices, Dade County, Congress' mandate provides the premise for Dade County's MBE plan. Accordingly, *Fullilove* is the proper standard for this court to apply. I emphasize again, nothing written in *Croson* or *Metro Broadcasting* invalidates our prior *Fullilove* analysis of Dade County's plan. The majority's invocation of the words "local law" does not change the fact that Congress mandated Dade County's MBE program.

Indeed, this court addressed the same issue in *S.J. Groves & Sons Co. v. Fulton County*, 920 F.2d 752 (11th Cir.1991). In *S.J. Groves*, the court considered a constitutional challenge to an MBE premised upon the Airport and Airway Development Act of 1970, as amended (AADA). Like the STAA at issue here, the AADA conditioned the receipt of federal grant monies on governmental development and approval of an MBE program. In addition, the language of the AADA is strikingly similar to the language of the STAA. The AADA provides:

> The Secretary shall take affirmative action to assure that no person shall, on the grounds of race, creed, color, national

origin, or sex, be excluded from participating in any activity conducted with funds received from any grant made under this chapter. The Secretary shall promulgate such rules as the Secretary deems necessary to carry out the purposes of this section ...

49 U.S.C.App. § 2219. The *S.J. Groves* court construed this language as a "congressional delegation of the power to enact a program such as the MBE Program at issue ..." 920 F.2d at 764. The *S.J. Groves* panel then evaluated an MBE program *Fulton County developed* under a *Fullilove* standard of scrutiny and found it constitutional. The analogous facts of this case should produce the same result.

It is interesting to note that in *Porter II*, this court found that Dade County relied on Congress' legislative findings which "clearly established that minorities were not participating in government contracts." 825 F.2d at 331. In fact, in *Porter II*, Porter attempted to rely on this court's previous holding in *South Florida Chapters of Associated Contractors of America v. Metropolitan Dade County*, 723 F.2d 846 (11th Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984). The *Porter II* court distinguished *South Florida* from the present case finding that *South Florida* involved a county ordinance, while this case involved a congressionally mandated minority plan. *Porter II*, 825 F.2d at 329–331.

Additionally, the record now before the court indicates that Dade County did perform studies to support the five percent set aside goal. During July and August, 1979, Dade County developed its goal for the contract under the constant scrutiny of the Equal Opportunity Division of the county transit agency. The Equal Opportunity Division and county engineers determined the contract portions available for subcontracting. They also utilized a national directory for minority businesses to locate minority firms who could supply nuts and bolts, and perform assembly and fabrication work. Additionally, the Equal Opportunity Division and county engineers conducted a telephone spot check of minority firms listed in the directory to confirm the current status and the MBEs' ability to do the work. Thus, Dade County determined that minority firms could do splice joint assembly and expansion joint assembly work, in addition to furnishing nuts and bolts. Accordingly, the engineers estimated the total contract price at $7 million to $8 million. They estimated splice joint assembly cost at $300,000 to $350,000, and expansion joint assembly at $150,000 to $200,000. The engineers then set the minority goal at five percent of the estimated total contract price, which equaled $350,000 to $400,000. Thus, Dade County did conduct an investigation to determine an appropriate set aside goal.

Neither *Croson* nor *Metro Broadcasting* affects this court's prior ruling concerning Dade County's MBE plan. The majority opinion merely overlooks the entity which mandated Dade County's MBE plan and creates a conflict in this circuit's case law, in light of this court's prior holding in *S.J. Groves*.

It is worth noting that if the validity of a program is always premised on an explicit, local finding of discrimination, regardless of which governmental entity promulgated the plan, we will never remedy past discrimination in industries where, because the discrimination was so complete, it dissuaded minorities from participation altogether. The majority's rationale would lead to the conclusion that no evidence of discrimination exists because minorities never attempted to enter the industry in the first place. Surely this was not the intended result when Congress mandated the use of minority businesses in government contracts.

For these reasons, I respectfully dissent.