909 F.2d 1371
 32 ERC 1243, 21 Envtl. L. Rep. 20,256
 HECLA MINING COMPANY, Plaintiff-Appellant,
v.
UNITED STATES of America; John S. Herrington, as Secretary
of U.S. Department of Energy; A. David Rossin, as Assistant
Secretary for Nuclear Energy; James D. Anderson, as Project
Manager, Uranium Mill Tailings Remedial Action Project
Office, U.S. Department of Energy; Thomas Vernon, as
Executive Director, Colorado Department of Health; and
Howard Roitman, as Uranium Mill Tailings Remedial Action
Project Manager, Colorado Department of Health, Defendants-Appellees.
 No. 88-2958.
 United States Court of Appeals,
Tenth Circuit.
 July 31, 1990.
 
 Joseph M. McMahon, Jr., Elizabeth H. Temkin, and Roger L. Freeman of Davis Graham & Stubbs, Denver, Colo., on the briefs, for plaintiff-appellant.
 Donald A. Carr, Acting Asst. Atty. Gen. for the Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Michael J. Norton, Acting U.S. Atty., D. Colo., J. Greg Whitehair, Asst. U.S. Atty., D. Colo., Dirk D. Snel, Jeffrey P. Kehne, and David W. Zugschwerdt, Attys. for the Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., and P. Benjamin Underwood, Atty., Office of Gen. Counsel, U.S. Dept. of Energy, Washington, D.C., of counsel, for Federal defendants-appellees.
 Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., and Jerry W. Goad, First Asst. Atty. Gen., Natural Resources Section, State of Colo., Denver, Colo., for State defendants-appellees.
 Before McKAY, MOORE and ANDERSON, Circuit Judges.
 McKAY, Circuit Judge.
 
 
 1
 This case involves an appeal from the district court's grant of summary judgment. The district court refused to declare plaintiff's land parcels part of a government-funded cleanup program and refused to order defendants to undertake remedial action at the sites.
 
 I. Facts
 
 2
 Hecla Mining Company owns two parcels near Naturita, Colorado. The first parcel, the Naturita parcel, was used to produce uranium for contracts with the United States government from 1939 to 1963. This production resulted in over 600,000 tons of waste known as tailings. In 1977, Ranchers Exploration and Development Corporation--Hecla's predecessor-in-interest--moved most of the tailings to a second site in Durita, Colorado. Ranchers then reprocessed the tailings at the Durita site recovering uranium and other metals. Ranchers worked under a Colorado license authorizing the movement and reprocessing. The license required Ranchers to stabilize and control the waste produced by the reprocessing.
 
 
 3
 In 1978, Congress enacted the Uranium Mill Tailings Radiation Control Act of 1978 ("UMTRCA"). The purpose of UMTRCA was to stabilize and control uranium tailings at sites throughout the country. Title I of UMTRCA focuses on inactive mill sites previously used to produce uranium for government contracts. Under Title I, a property is designated by the Secretary of Energy as a "processing site." Once a site is designated, the federal government funds ninety percent of the cleanup, while the states pay the remaining ten percent. The owners of the sites pay nothing for the cleanup of their property.
 
 
 4
 The basic issue in this case is whether the Durita property should be designated as a "processing site." Although the Naturita site was originally at issue in this suit, both parties have now agreed that Naturita is covered by UMTRCA and must be cleaned up as required by the statute. The parties have been unable, however, to agree on the disposition of the Durita site.
 
 
 5
 Section 7912 of UMTRCA directs the Secretary of Energy to designate, within one year, processing sites at or near twenty specified locations including Naturita, Colorado. 42 U.S.C. Sec. 7912(a)(1) (1982). The statute also provides that:
 
 
 6
 Notwithstanding the one year limitation contained in this section, the Secretary may, after such one year period, include any area described in Section 7911(6)(B) of this title [describing sites in the vicinity of actual processing sites] as part of a processing site designated under this section if he determines such inclusion to be appropriate to carry out the purposes of this subchapter.
 
 
 7
 42 U.S.C. Sec. 7912(e)(2) (1982). The Durita site was not designated during the first year after UMTRCA was passed. Thus, plaintiff argues that the defendants should designate the Durita property as a processing site under section 7912(e)(2).
 
 
 8
 UMTRCA specifically defines what the Secretary is required to designate as a processing site.
 
 
 9
 The term "processing site" means--
 
 
 10
 (A) any site, including the mill, containing residual radioactive materials at which all or substantially all of the uranium was produced for sale to any Federal agency prior to January 1, 1971 under a contract with any Federal agency, except in the case of a site at or near Slick Rock, Colorado, unless--
 
 
 11
 (i) such site was owned or controlled as of January 1, 1978, or is thereafter owned or controlled, by any Federal agency, or
 
 
 12
 (ii) a license (issued by the Commission or its predecessor agency under the Atomic Energy Act of 1954 or by a State as permitted under section 274 of such Act) for the production at such site of any uranium or thorium product derived from ores is in effect on January 1, 1978, or is issued or renewed after such date; and
 
 
 13
 (B) any other real property or improvement thereon which--
 
 
 14
 (i) is in the vicinity of such site, and
 
 
 15
 (ii) is determined by the Secretary, in consultation with the Commission, to be contaminated with residual radioactive materials derived from such site.
 
 
 16
 42 U.S.C. Sec. 7911(6) (1982).
 
 
 17
 In 1979 and 1980, Ranchers sought the designation of the Durita property as a processing site in correspondence with the Department of Energy. DOE consistently refused Ranchers' requests. Hecla merged with Ranchers in 1984. On January 30, 1987, Hecla again sought designation of the Durita property in a letter to DOE. DOE again responded in a letter dated March 13, 1987, stating that UMTRCA did not require designation of the Durita property. DOE gave the same reasons it had given in 1980. Hecla (plaintiff) filed the current lawsuit seeking designation of the Durita property on October 24, 1987. Plaintiff now claims that the Secretary should designate the Durita property as a processing site under the "vicinity" property language found at section 7911(6)(B).
 
 
 18
 After this lawsuit was filed, DOE filed notice in the Federal Register on April 28, 1988, proposing not to designate the Durita property. See Proposed Decision, 53 Fed.Reg. 15,273 (1988). After reviewing the comments on its proposed decision, DOE published an official refusal to designate the Durita property on July 19, 1988. See Final Decision, 53 Fed.Reg. 27,332 (1988).
 
 
 19
 On October 19, 1988, the district court granted the government's summary judgment motion and dismissed plaintiff's claims. Plaintiff now appeals that dismissal.
 
 II. Standard of Review
 
 20
 In reviewing the district court's grant of summary judgment, we view the case in the same manner as did the district court. Osgood v. State Farm Mut. Auto. Ins. Co., 848 F.2d 141, 143 (10th Cir.1988); R-G Denver v. First City Holdings of Colorado, Inc., 789 F.2d 1469, 1471 (10th Cir.1986). We must determine whether any genuine issue of material fact exists and, if not, whether the substantive law was correctly applied. See Fed.R.Civ.P. 56(c); Osgood, 848 F.2d at 143. Plaintiff does not challenge the factual determinations of the district court. Instead, plaintiff challenges the district court's process, standard of review, and conclusions of law. Thus, our duty is to see that the district court correctly applied the substantive and procedural law.
 
 
 21
 The district court reviewed the administrative record to see whether DOE's decision was reasonable. Plaintiff claims that reasonableness review of DOE's legal determination was improper because the notice and comment proceeding itself was inappropriate. Plaintiff claims that notice and comment proceedings are inappropriate for pure issues of law and should be reserved for resolution of factual issues. Plaintiff also challenges the timing of the notice and comment proceeding, suggesting that DOE went through the procedure merely to bolster its litigation position.
 
 
 22
 We hold that the notice and comment proceeding was within the requirements of the law. Plaintiff is simply incorrect in asserting that notice and comment procedure is inappropriate for legal decisions. "The basic procedure for deciding a disputed question of law should be and usually is notice and comment procedure--receiving parties' briefs and perhaps listening to their oral arguments." 3 K. Davis, Administrative Law Treatise Sec. 14.4 at 19 (2d ed.1980). Plaintiff cites two cases indicating that development of a record in cases involving statutory interpretation is not necessary. See R.R. Yardmasters of America v. Harris, 721 F.2d 1332, 1338-39 (D.C.Cir.1983); United Transp. Union v. Dole, 797 F.2d 823, 828 (10th Cir.1986). However, these cases do not support plaintiff's assertion that notice and comment procedure was inappropriate in this case. Neither of the cited cases hold that notice and comment procedure is inappropriate in making legal decisions or in any other setting. They simply indicate that in statutory interpretation "development of a record before the agency or by the agency is not pressing," United Transp., 797 F.2d at 828, and that statutory development "does not require the development of a factual record," R.R. Yardmasters, 721 F.2d at 1338. These cases do not hold that notice and comment proceedings are barred; they merely hold that such procedures are not required in resolving questions of law.
 
 
 23
 In addition, UMTRCA specifically authorizes DOE to promulgate rules and to hold public hearings. "The Secretary may prescribe such rules consistent with the purposes of this chapter as he deems appropriate pursuant to Title V of the Department of Energy Organization Act." 42 U.S.C. Sec. 7919 (1982).
 
 
 24
 In carrying out the provisions of this subchapter, including the designation of processing sites, establishing priorities for such sites, the selection of remedial actions, and the execution of cooperative agreements, the Secretary, the Administrator, and the Commission shall encourage public participation and, where appropriate, the Secretary shall hold public hearings relative to such matters in the States where processing sites and disposal sites are located.
 
 
 25
 42 U.S.C. Sec. 7921 (1982). These provisions indicate a Congressional emphasis on public input and rulemaking. The notice and comment proceeding furthers both goals. In addition, the Supreme Court has specifically held that the choice of what procedure to use lies with the agency. NLRB v. Bell Aerospace Co., 416 U.S. 267, 290-94, 94 S.Ct. 1757, 1769-72, 40 L.Ed.2d 134 (1974).
 
 
 26
 Although neither the Administrative Procedure Act nor UMTRCA specifically authorize notice and comment procedure under the specific facts of this case, UMTRCA does authorize rulemaking and public hearings in the designation of processing sites. In addition, the APA authorizes notice and comment proceedings in general. These provisions, combined with the Supreme Court's ruling that the choice of procedures is left to the agency, support the DOE's procedure in this case. Thus, we hold that DOE was authorized to conduct a notice and comment proceeding under the facts of this case.
 
 
 27
 Plaintiff next complains about the timing of the notice and comment proceeding. Plaintiff alleges that DOE engaged in the procedure merely to bolster its litigation posture. We find plaintiff's position unpersuasive. The possibility that DOE conducted the notice and comment proceeding because of the filing of this lawsuit does not change DOE's authority to conduct the procedure. Plaintiffs cannot limit an agency's discretion to conduct administrative proceedings by filing a lawsuit. We hold that the timing of DOE's notice and comment proceeding, in relation to the timing of Hecla's suit, did not change the validity of the administrative action.
 
 
 28
 Having concluded that the notice and comment proceeding in this case was authorized and appropriate, we review this final agency action to see if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A) (1988). We previously applied this standard in a case very similar to the one at bar.
 
 
 29
 For the type of informal notice-and-comment rulemaking at issue here, the APA specifies that agency action may be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A)....
 
 
 30
 In determining whether an administrative regulation permissibly construes the statute that an agency is charged with enforcing, our inquiry is shaped by the specificity of the congressional enactment: ... "If ... the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."
 
 
 31
 Quivira Mining Co. v. United States Nuclear Regulatory Comm'n., 866 F.2d 1246, 1249 (10th Cir.1989) (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)) (citations omitted).
 
 
 32
 The district court reviewed DOE's action under this standard. In reviewing the district court's grant of summary judgment on this issue, we adopt the same standard of review. By arguing that DOE's notice and comment procedure was contrary to law, plaintiff seeks to avoid our deferential review of DOE's legal conclusions. Instead, plaintiff seeks de novo review of the statutory interpretation issue. However, under the facts of this case even de novo review would involve deference to the agency's interpretation. "Although the construction of the statutes and regulations before us is for the courts, it does not follow that the agency interpretation is to be disregarded by a reviewing court. Deference is due the construction of a statute or a regulation of an administrative agency." Hoover & Bracken Energies, Inc. v. United States Dep't of Interior, 723 F.2d 1488, 1489 (10th Cir.1983). The Supreme Court has held that when Congress explicitly or implicitly delegates to agencies the power to elucidate a specific provision of a statute, the resulting agency action is entitled to deference.
 
 
 33
 If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provison [sic] for a reasonable interpretation made by the administrator of an agency.
 
 
 34
 Chevron, 467 U.S. at 843-44, 104 S.Ct. at 2782. Congress delegated to DOE the power to designate processing sites under UMTRCA. The "vicinity" language of section 7911(6)(B) represents a gap Congress left the DOE to fill. Thus, even in the absence of a notice and comment proceeding, we would at least give some deference to the agency's consistent position that the Durita site should not be designated under UMTRCA.
 
 III. Designation of a Vicinity Property
 
 35
 This case comes down to the question of whether DOE's interpretation of UMTRCA is reasonable and permissible. DOE concluded that the Durita property did not meet the UMTRCA requirements for a vicinity property. In order to qualify as a vicinity property under UMTRCA, a site must meet at least three basic requirements. The property must (1) be in the vicinity of a processing site, (2) be contaminated with residual radioactive materials, and (3) the contamination must be derived from the processing site. See 42 U.S.C. Sec. 7911(6)(B) (1982). Both parties agree that the Durita property is "in the vicinity" of the processing site on the Naturita property. Both parties also agree that the Durita property is contaminated with radioactive materials. However, DOE argues that the contamination is not "residual radioactive material" and that it was not "derived from" the Naturita site. In addition, DOE claims that Ranchers' state license removes the Durita property from UMTRCA consideration.
 
 
 36
 UMTRCA defines the term "residual radioactive material" as follows:
 
 
 37
 The term "residual radioactive material" means--
 
 
 38
 (A) waste (which the Secretary determines to be radioactive) in the form of tailings resulting from the processing of ores for the extraction of uranium and other valuable constituents of the ores; and
 
 
 39
 (B) other waste (which the Secretary determines to be radioactive) at a processing site which relate to such processing, including any residual stock of unprocessed ores or low-grade materials.
 
 
 40
 42 U.S.C. Sec. 7911(7) (1982). DOE's position is that the material taken from the Naturita site to the Durita site was not "waste" as required by the definition of residual radioactive material because the material was used as the raw material for a processing plant that produced uranium for commercial sale. Therefore, DOE argues that the material at the Durita site is not residual radioactive material.
 
 
 41
 DOE's interpretation of the statute is questionable. After the definition of vicinity property, the statute states:
 
 
 42
 A license for the production of any uranium product from residual radioactive materials shall not be treated as a license for production from ores within the meaning of subparagraph (A)(ii) if such production is in accordance with section 7918(b) of this title.
 
 
 43
 42 U.S.C. Sec. 7911(6) (1982) (emphasis added). This language clearly indicates that uranium can be produced from "residual radioactive materials"--just as occurred at the Durita site. This sentence implicitly assumes that tailings used to produce uranium can still be designated as residual radioactive materials. Thus, DOE's conclusion that residual radioactive material is no longer waste--and therefore no longer residual radioactive material--when it is used to produce uranium is incorrect. We hold that DOE's interpretation of the statutory language "residual radioactive material" is unreasonable.
 
 
 44
 However, we uphold on other grounds DOE's ultimate conclusion that the statute does not include the Durita site. First, we agree with DOE's finding that the residual radioactive material at the Durita site is not "derived from" the Naturita site. UMTRCA does not define the meaning of "derived from." However, we conclude that DOE's position--that the waste at the Durita site is "derived from" the processing on that site and not from the Naturita mill--is a reasonable interpretation of the statute. If Ranchers had merely transported the tailings to the Durita site for safer storage, then they would be derived from the Naturita site. However, when the tailings are used as raw material in a reprocessing procedure, we hold that it is a permissible interpretation of the statute to categorize the "new" waste produced by the reprocessing procedure as material "derived from" the new procedure at the new site. UMTRCA was enacted to make safe uranium tailings that were produced in order to fill government contracts. When these tailings are subsequently used in a private commercial reprocessing venture, the resulting residual radioactive material is derived from the commercial venture and not the initial processing at the production site.
 
 
 45
 In addition, we find DOE's interpretation of the statute reasonable because of the licensing limitation found in the statute's definition of processing sites. The statute excludes from the definition of processing site any properties for which a state license for the production of uranium was in effect on or after January 1, 1978. See 42 U.S.C. Sec. 7911(6)(A)(ii) (1982). Ranchers obtained its reprocessing license from the state of Colorado in 1977. Thus, if the license limitation found in section 7911(6)(A)(ii) applies to the Durita property, the site is clearly not covered by the statute.
 
 
 46
 Unfortunately, the statute does not make clear whether the license exception was intended to apply to vicinity properties. The exception is contained in subsection (A) of the definition of processing site, while the definition of vicinity properties is found in subsection (B). However, immediately following subsection (B)--with no separate numerical designation--is the language previously quoted concerning licenses to produce uranium from residual radioactive materials. This language provides that the license exception does not apply to licenses given for production of uranium from residual radioactive materials if such production is in accordance with 42 U.S.C. Sec. 7918(b) (1982). It is undisputed that Ranchers' production at the Durita site was not in accordance with section 7918(b). We think a fair inference from this language is that if production from residual radioactive materials is not in accordance with section 7918(b), then the license exception applies and the government is not obliged to pay for the cleanup of the property. We also believe that the placement of this language following subsection (B) makes the statute ambiguous as to whether the language is meant to apply to the vicinity properties under subsection (B) or solely to the processing sites defined in subsection (A). DOE applied the licensing exception to the Durita property. We hold that this is a permissible interpretation of the statute.
 
 
 47
 The legislative history of UMTRCA also supports DOE's interpretation of this ambiguous statute. One House report on UMTRCA states:
 
 
 48
 The committee questioned the expenditure of Federal funds to clean up uranium mill tailings in cases where the commercial uranium milling industry can be required through regulatory authorities to assume those costs. It would seem therefore, that the Secretary of Energy need not designate any sites to be included in the authorized program which are currently under active license, or which contain tailings from commercial production, unless it can be shown that the tailings hazards could in no way be remedied without such designation.
 
 
 49
 H.R.Rep. No. 1480(I), 95th Cong., 2d Sess., pt. 1, at 13, reprinted in 1978 U.S.Code Cong. & Admin.News 7433, 7436. Thus, at least the House Interior and Insular Affairs Committee felt that the government's obligations under UMTRCA would be limited to sites that were not under active license requiring the stabilization of the tailings.
 
 
 50
 The House Interstate and Foreign Commerce Committee also reported its belief that the main purpose for enacting UMTRCA was to clean up tailings where the owners of the property were not then under any state or federal obligation to perform their own cleanup.
 
 
 51
 The lack of any control over these inactive sites under the 1954 act and other laws to require clean up of these sites is the principal basis for committee action to authorize this remedial program. This situation does not exist at active mill tailings sites.
 
 
 52
 ... [W]e stress that the lack of any specific statutory authority requiring the effective stabilization of these mills by the NRC or the States after operations ceased and licenses terminated is the principal reason for recommending this program.
 
 
 53
 H.R.Rep. No. 1480(II), 95th Cong., 2d Sess., pt. 2, at 30, reprinted in 1978 U.S.Code Cong. & Admin.News 7450, 7457. Because the Durita site was under active license requiring the stabilization of the tailings, the legislative history indicates that Congress did not intend for the Durita property to be designated a processing site.
 
 
 54
 Plaintiff continually refers to the broad language found in the purposes section of UMTRCA stating that the statute is intended to "stabilize and control such tailings in a safe and environmentally sound manner." 42 U.S.C. 7901(b)(1) (1982). However, even this section is specifically limited to "inactive mill tailings sites." Id. Thus, we conclude that DOE's application of the license exception to a vicinity property is a permissible interpretation of the statute. We hold that DOE's conclusion--that the Durita property does not fulfill the statutory requirements for a processing site--is reasonable. Therefore, we affirm the district court's grant of summary judgment for all the federal government defendants.
 
 IV. Claims Against the State of Colorado
 
 55
 The state of Colorado would be liable for its share of the cleanup costs only if DOE properly designated the Durita property as a processing site.* In light of our conclusion that DOE properly refused to designate the Durita site as a processing site, we affirm the district court's grant of summary judgment for all of the state defendants.
 
 V. Mandamus Authority
 
 56
 The issue whether the district court had authority to order DOE to designate the Durita site for cleanup is rendered moot by our resolution of the statutory question. Because we affirm DOE's decision that the Durita property is not covered by UMTRCA, it is unnecessary for us to consider whether the district court had the power to order DOE to act.
 
 VI. Conclusion
 
 57
 Although we find part of DOE's interpretation of UMTRCA to be contrary to the language of the statute, we uphold DOE's ultimate conclusion that the federal and state governments are not required to pay for the cleanup at the Durita site. We affirm the district court's grant of summary judgment for all defendants.
 
 
 58
 AFFIRMED.
 
 
 
 *
 The Colorado defendants have already settled their liability regarding the Naturita site